## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In the Matter of the<br>YELLOW LINE CASES,<br><br>LEAD CASE: *Glover, et al., v. Washington*<br>*Metropolitan Area Transit Authority*<br><br>THIS DOCUMENT RELATES TO: <u>ALL CASES</u> | Case No. 1:15-mc-00989-TSC-GMH |

## <u>DEFENDANT DISTRICT OF COLUMBIA'S MOTION TO DISMISS PLAINTIFFS' MASTER COMPLAINT AND CO-DEFENDANT WASHINGTON METROPOLITAN TRANSIT AUTHORITY'S CROSS-CLAIM</u>

Defendant District of Columbia (the District) moves to dismiss Count II of Plaintiffs' Master Complaint [225] and Co-Defendant Washington Metropolitan Transit Authority's Cross-claim [236] for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

The Plaintiffs in these consolidated cases allege that they suffered injury when they were trapped in a tunnel on a smoke-filled Metro train for approximately forty-five minutes before they were rescued by members of the District of Columbia's Fire and Emergency Medical Services Department (FEMS). Plaintiffs have sued Co-Defendant Washington Metropolitan Transit Authority (WMATA) for alleged negligence in allowing the fire that caused the smoke to start, and for failing to respond properly to the fire. Plaintiffs have also sued the District for alleged negligence in failing to rescue Plaintiffs sooner than forty-five minutes after the event began. WMATA has filed a cross-claim against the District seeking contribution or indemnity for allegedly causing or contributing to the Plaintiffs' injuries by failing to rescue the Plaintiffs sooner.

As set forth in the accompanying memorandum, the public duty doctrine bars any liability based on the District's alleged failure to provide services that are provided to the public

at large, including, as in this case, the alleged failure to provide emergency services in a more timely fashion.  Similarly, to the extent that Plaintiffs and WMATA seek to impose liability on the District for discretionary acts, their claims are barred by sovereign immunity.

### Local Rule 7(m) Statement

The District did not seek Plaintiffs' or WMATA's consent because this is a dispositive motion.  *See* LCvR 7(m).

Dated: January 25, 2017         Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Jonathan H. Pittman*
JONATHAN H. PITTMAN [430388]
Assistant Deputy Attorney General
Civil Litigation Division
Office of the Attorney General for the District of Columbia
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202) 724-6602
Email:  jonathan.pittman@dc.gov

*/s/ William J. Chang*
WILLIAM J. CHANG [1030057]
Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202) 724-6646
Email: willliam.chang@dc.gov

***Counsel for the District of Columbia***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion, accompanying Memorandum of Points and Authorities, and Proposed Order was served electronically on all counsel of record via the Court's ECF system this 25th day of January, 2017.

In addition, I certify that on this 25th day of January, 2017, a copy of the same was served on *pro se* plaintiff Lauren Hawkins (in Civil Action No. 16-cv-289-TSC) by mailing a copy to her, postage prepaid, addressed as follows:

> Lauren Hawkins
> c/o Thelma Hawkins
> 3957 Blaine Street, NE
> Washington, D.C. 20019

> */s/ William J. Chang*
> William J. Chang

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| In the Matter of the YELLOW LINE CASES, ) ) ) ) LEAD CASE: *Glover, et al., v. Washington Metropolitan Area Transit Authority* ) ) ) THIS DOCUMENT RELATES TO: <u>ALL CASES</u> ) ) ) | Case No. 1:15-mc-00989-TSC-GMH |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA'S**
**<u>MOTION TO DISMISS PLAINTIFFS' MASTER COMPLAINT AND WMATA'S</u>**
**<u>CROSS-CLAIM</u>**

The Plaintiffs in these consolidated cases allege that they suffered injury when they were trapped in a tunnel on a smoke-filled Metro train for approximately forty-five minutes before they were rescued by members of the District of Columbia's Fire and Emergency Medical Services Department (FEMS). Plaintiffs have sued Co-Defendant Washington Metropolitan Transit Authority (WMATA) for alleged negligence in allowing the fire that caused the smoke to start, and for failing to respond properly to the fire. Plaintiffs have also sued the District of Columbia (the District) for alleged negligence in failing to rescue Plaintiffs sooner than forty-five minutes after the event began. WMATA has filed a cross-claim against the District seeking contribution or indemnity for allegedly causing or contributing to the Plaintiffs' injuries by failing to rescue the Plaintiffs sooner.

The Court should dismiss Plaintiffs' claims and WMATA's cross-claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The public duty doctrine bars any liability based on the District's alleged failure to provide services that are provided to the public at large,

including, as in this case, the alleged failure to provide emergency services in a more timely fashion.  Similarly, to the extent that Plaintiffs and WMATA seek to impose liability on the District for discretionary acts, their claims are barred by sovereign immunity.  Because the public duty doctrine and sovereign immunity bar all claims against the District in this case, the Court should dismiss all claims and cross-claims against the District with prejudice.

## **INTRODUCTION**

On January 12, 2015, at approximately 3:15 p.m., WMATA Train 302 encountered dense smoke and came to an emergency halt in the tunnel between the L'Enfant Plaza Station and the Potomac River Bridge on the Yellow Line track headed to Huntington, Virginia.  There were over two hundred passengers on board.  Emergency personnel from the District of Columbia Fire and Emergency Medical Services Department (FEMS) responded and evacuated the passengers at approximately 4:00 p.m.  One passenger, Carol Glover, died, and other passengers were exposed to smoke for about forty-five minutes.

Approximately one hundred passengers, along with the estate of Ms. Glover, filed separate civil actions against WMATA in this Court.  Those cases were consolidated in this Master Case File on July 29, 2015.  [ECF 1].  This case has been stayed until the National Safety Transportation Board releases its Final Accident Report.  On September 19, 2016, the Court lifted the stay to permit the Plaintiffs to amend their complaints and assert claims against additional parties.  The Plaintiffs thereafter filed and served amended complaints naming the District of Columbia as an additional defendant.  The Court ordered the Plaintiffs to file a single Master Complaint against all parties, which the Plaintiffs filed on December 9, 2016.  *See* Master Compl. [225].

The Plaintiffs' Master Complaint asserts negligence claims against WMATA and the District.  With respect to the District, Plaintiffs allege that FEMS failed to provide "prompt,

competent medical treatment and fire rescue services to the general public, including the passengers trapped in Train 302." *Id*. at ¶ 340. Plaintiffs claim that FEMS' alleged failure to coordinate the rescue response with WMATA officials resulted in the rescue taking longer than it should have. *Id*. at 342. Plaintiffs claim that as a result of this alleged failure, they were trapped in Train 302 for almost forty-five minutes, and that each of them (other than Ms. Glover and Stephanie Watts, the Plaintiff in Civil Action No. 16-0379) "suffered severe injuries due to smoke inhalation and fear of impending death over the course of approximately forty-five minutes while a passenger on WMATA Yellow Line Train 302." *See generally* Master Complaint, ¶¶ 9 - 309.[1] In short, Plaintiffs allege that FEMS should have rescued them sooner (although the Master Complaint does not say how much sooner).

On January 9, 2017, WMATA filed a Motion to Dismiss Plaintiffs' Master Complaint, [235], as well as a cross-claim against the District for contribution or indemnity. [236]. In its cross-claim, WMATA identifies the Metro Rail Transit - Fire/Rescue Emergency Procedures Policy Agreement (the Policy) as a "specific undertaking agreed to by the District so as to protect WMATA." Cross-claim ¶ 13 [236] and Exhibit B thereto [236-2]. WMATA relies on this Policy to aver that it is "completely dependent and justifiably reliant [on FEMS] to provide fire and emergency medical services." *Id*. at ¶ 13. WMATA alleges that FEMS officials breached their obligations under this Policy by, *inter alia*, not establishing a Unified Incident Command and ignoring WMATA officials' efforts to coordinate the rescue response. *Id*. at ¶ 20. WMATA also challenges the training and credentials of FEMS' Incident Commander, the official in charge

---

[1]     Ms. Watts does not allege that she was a passenger on Train 302. Rather, she alleges that she suffered injuries due to smoke inhalation "while standing on the platform of the L'Enfant Metro Station. Master Compl. ¶ 288. Because she fails to alleged that FEMS failed to rescue her or had anything to do with her injuries, the Court should dismiss her claims against the District for failure to state a claim.

of the rescue. *Id*. at ¶ 30. All this, according to WMATA, caused or exacerbated the injuries of the passengers on Train 302.

## PLAINTIFFS' AND WMATA'S FACTUAL ALLEGATIONS

WMATA owns and operates the Metro subway system in the Washington metropolitan region. It was created by the WMATA Compact. D.C. Code §§ 9-1107.01-12. Maryland, Virginia, and the District are signatories to this Compact. *Id*. at § 9-1107.01. The Compact provides for tort liability against WMATA for any negligent acts or omissions "committed in the conduct for any proprietary function," but not for torts committed "in the performance of a governmental function." *Id*. at § 9-1107.01(80). This Court has original jurisdiction to hear civil actions filed against WMATA. *Id*. at § 9-1107.10.

On January 12, 2015, at approximately 3:15 p.m., six-car Train 302 left the L'Enfant Plaza Station on the Yellow Line in the direction of Huntington, Virginia. Master Compl. ¶ 313. Several hundred feet after departing the station, the train encountered dense smoke in the tunnel and stopped. *Id*. at ¶ 314. Plaintiffs allege that a faulty circuit breaker on the third rail (the conductor running alongside the tracks that supplies electricity to power the trains) tripped and caused the electrical malfunction. *Id*. at ¶ 315.[2] Over the next several minutes the WMATA Operations Control Center (OCC) tried to activate ventilators in the tunnel to remove the smoke. *Id*. at ¶ 318. These ventilation fans failed to activate or activated in the wrong direction. *Id*.

The District's Office of Unified Communications (OUC) handles all calls for emergency service in the District. OUC received the first 9-1-1 call at approximately 3:18 p.m., when a

---

[2]     The National Transportation Safety Board (NTSB) is conducting an investigation into the "L'Enfant Plaza Station Electrical Arcing and Smoke Accident." No final report has been issued by NTSB as of the date of this motion. A preliminary report was issued on May 3, 2016, http://www.ntsb.gov/investigations/AccidentReports/Pages/DCA15FR004_preliminary.aspx. This NTSB preliminary report stated that the smoke in the tunnel was due to "severe electrical arcing." *See also* Master Compl. ¶ 319.

construction worker reported smoke emanating from a Metro ventilation shaft located at 9th Street and Maine Avenue, SW. *Id*. at ¶ 320. Minutes later, OUC received a 9-1-1 call from the WMATA Supervisor of Metro Rail Unit 22 reporting heavy smoke in the L'Enfant Plaza Station. *Id*. at ¶ 321.

At approximately 3:28 p.m., OUC dispatched FEMS personnel to respond to these calls for service. *Id.* at ¶ 323. FEMS first responders arrived within three minutes, at approximately 3;31 p.m. *Id*. at ¶ 324. According to Plaintiffs, poor communication between WMATA and FEMS officials delayed their rescue from the train. *Id*. at ¶ 325. Plaintiffs claim that these officials failed to establish a unified command post and that FEMS' battalion fire chief turned down the WMATA operations commander's efforts to coordinate the rescue response. *Id*. at ¶ 326-27; 342. At approximately 3:44 p.m., WMATA confirmed for FEMS officials that the electricity to the third rail had been shut off. *Id*. at ¶ 330. Plaintiffs allege that although FEMS officials were ready to evacuate Train 302's passengers at 3:49 p.m., the evacuation did not begin until 4:00 p.m. because of WMATA's failure to timely apprise FEMS officials that it was safe to commence the rescue. *Id*. at ¶ 331.

WMATA seeks to hold the District liable for any alleged shortcomings in the rescue response. *See generally* Cross-claim at ¶¶ 20-33. According to WMATA, the FEMS Incident Commander's lack of training and various communication failures, including the failure to establish a unified command post in accordance with the Policy, delayed the rescue, "resulting in a substantially longer exposure to smoke by passengers on Train 302." *Id*. at ¶ 28.

## STANDARD OF REVIEW

A court must dismiss a complaint when it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotations omitted).   Although

the court accepts as true all of the allegations contained in the complaint, this tenet "is

inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."   *Id.*; *see also Kowal v. MCI Commc'ns

Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (The "court need not accept inferences drawn by

plaintiffs if such inferences are unsupported by the facts set out in the complaint.   Nor must the

court accept legal conclusions cast in the form of factual allegations.").   Ultimately, "only a

complaint that states a plausible claim for relief survives a motion to dismiss."   *Iqbal*, 556 U.S. at

679 (citation omitted).

## ARGUMENT

### I.   The Public Duty Doctrine Bars Plaintiffs' Claims And WMATA's Cross-Claims Against The District.

The gravamen of Plaintiffs' negligence claim against the District is that the District failed

to provide rescue services in a timely manner.   WMATA's cross-claim is based on the same

allegation.   The public duty doctrine establishes that the District may not be held liable for the

allegedly negligent failure to provide emergency services (or the failure to provide such services

in a timely manner), absent a showing that the plaintiff had a "special relationship" with the

District.   Because the allegations of the Master Complaint and WMATA's Cross-Claim make

clear that any claims against the District are barred by the public duty doctrine, and because

neither Plaintiffs nor WMATA allege facts that could establish the existence of a "special

relationship" with the District, the Court should dismiss Plaintiffs' claims and WMATA's cross-

claims against the District with prejudice.

**A.      The Public Duty Doctrine Bars Plaintiffs' Claims.**

The public duty doctrine "shield[s] the District and its employees from liability arising out of their actions in the course of providing public services." *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990). The public duty doctrine begins with the premise that, to show liability for negligence, a plaintiff must demonstrate that the defendant violated some legal duty. *See N.O.L. v. District of Columbia*, 674 A.2d 498, 499 n.2 (D.C. 1995) ("Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence."). The doctrine recognizes that "the District of Columbia has no duty to provide public services to any particular citizen." *Allison Gas Turbine v. District of Columbia*, 642 A.2d 841, 843 (D.C. 1994). Instead, "the duty to provide public services is owed to the public at large, and absent a special relationship between the [government] and an individual, no specific legal duty exists." *Id.* (quoting *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc)).

The D.C. Court of Appeal's en banc decision in *Warren* has been the seminal case on the public duty doctrine in the District for more than three decades. There, after relying on the mistaken assurance of police that help was on the way, the plaintiffs called out from their hiding place to a housemate who was being assaulted by intruders. 444 A.3d at 2. This enabled the intruders to learn of the plaintiffs' presence and kidnap and severely abuse them. *Id.* The Court held that the public duty doctrine barred an action based on the alleged negligence of the police, because they owed the plaintiffs no actionable duty. *Id.* at 4. Although it was "easy to condemn the failings of the police," no special relationship between the police and the plaintiffs existed on the facts of the case. *Id.* at 3-4.

*Warren* adopted the opinion of the Superior Court, which set forth how this result accorded with the common law and why it made sense. *Id.* at 4-9. The opinion explained:

> Establishment by the Court of a new, privately enforceable duty to use reasonable diligence in the performance of public functions would not likely improve services rendered to the public. The creation of direct, personal accountability between each government employee and every member of the community would effectively bring the business of government to a speedy halt, would dampen the ardor of all but the most resolute, or the most irresponsible in the unflinching discharge of their duties, and dispatch a new generation of litigants to the courthouse over grievances real and imagined. An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints.

*Id.* at 8-9 (footnote and internal quotation marks omitted).

The *Warren* Court was unanimous on the broad contours of the public duty doctrine that has been the law of the District for decades.[3] Indeed, less than two years later, the Court unanimously reaffirmed *Warren* in another en banc decision, *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983), where a police officer's wife claimed that the District failed to protect her from her violent husband. *Id.* at 1310.[4] She had warned his supervisor that her husband had threatened her with his service revolver, and asked the supervisor to keep her husband away from her, but her husband eventually located her in her new home and shot both her and their son. *Id.* at 1308-09. The Court held that the public duty doctrine applied, and that no special relationship existed that could expose the District to liability. *Id.* at 1318. It described "the various policies which have led the law to determine that the duty to prevent crime is a general duty owed to the public and, therefore, unenforceable by any one individual." *Id.* at

---

[3]   Judge Nebeker wrote this Court's decision, joined by Judges Kern, Harris, and Ferren in full and by Chief Judge Newman in relevant part. *Id.* at 1; *id.* at 12 (Newman, C.J., concurring in part and dissenting in part). Judges Kelly and Mack dissented in part but agreed: "The basic premise underlying the dismissals of these complaints is correct: unless a 'special duty' to a particular individual can be shown, public officials and governmental units owe only a general, nonactionable duty to members of the public to provide services such as fire and police protection." *Id.* at 9 (Kelly, J., concurring in part and dissenting in part).

[4]   Judge Gallagher wrote this Court's decision, joined by Judges Kern, Nebeker, Pryor, Belson and Terry. *Id.* at 1308. Judge Ferren dissented, joined by Chief Judge Newman and Judges Mack and Kelly, because he did not think the principle of *Warren* "properly applicable to th[e] case." *Id.* at 1319 (Ferren, J., dissenting).

1311.  "Foremost is the practical realization that individuals, juries and courts are ill-equipped to judge considered legislative-executive decisions as to how particular community resources should be or should have been allocated to protect individual members of the public."  *Id.* (internal quotation marks omitted).  "Severe depletion of these resources could well result if every oversight, omission or blunder made by a police official rendered a state or municipality potentially liable in compensatory, let alone punitive damages."  *Id.*

Divisions of the D.C. Court of Appeals have continued applying *Warren*'s teachings in the three decades since, in more than twenty published decisions.  This includes cases involving, as here, emergency services.  *See, e.g.*, *Hines*, 580 A.2d 133.  On some occasions, the Court has found special relationships between plaintiffs and the District that sufficiently distinguished them from the public, such that a negligence suit was allowed.[5]  On others, the Court has found the doctrine to preclude liability because the asserted negligence occurred in the course of a public duty and a special relationship was absent.[6]

---

[5]     *E.g.*, *Powell v. District of Columbia*, 602 A.2d 1123 (D.C. 1992) (vehicle registrant who received license plate belonging to another car**);** *Turner v. District of Columbia*, 532 A.2d 662 (D.C. 1987) (abused child reported to the District).

[6]     *E.g.*, *Woods v. District of Columbia*, 63 A.3d 551 (D.C. 2013) (ambulance personnel misdiagnosed plaintiff's condition); *Snowder v. District of Columbia*, 949 A.2d 590 (D.C. 2008) (police recovery of stolen vehicle without notifying owner); *Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) (student murdered while police investigated prior murder); *Miller v. District of Columbia*, 841 A.2d 1244 (D.C. 2004) (woman wrongly told her children were safe from fire, preventing rescue); *Taylor v. District of Columbia*, 776 A.2d 1208 (D.C. 2001) (police informant who declined protection); *Flemmings*, 719 A.2d 963 (officer shot by other officer); *Nealon v. District of Columbia*, 669 A.2d 685 (D.C. 1995) (owner of house damaged by fire due to hydrant's low water pressure); *Allison Gas Turbine*, 642 A.2d 841 (accident victims drowned after police prevented civilians from attempting rescue**);** *Auto World, Inc. v. District of Columbia*, 627 A.2d 11 (D.C. 1993) (car dealer to whom District had confirmed that vehicle title was valid); *Stoddard v. District of Columbia*, 623 A.2d 1152 (D.C. 1993) (child who crossed street away from crosswalk); *Cunningham v. District of Columbia*, 584 A.2d 573 (D.C. 1990) (women shot by parolee released after mental evaluation by District psychiatrist); *District of Columbia v. Forsman*, 580 A.2d 1314 (D.C. 1990) (neighbor of landowner whom District did not require to obtain demolition permit); *Wanzer v. District of Columbia*, 580 A.2d 127 (D.C.

Over these decades, the Court of Appeals has elaborated on "[a] number of public policy considerations [that] underlie the public duty doctrine":

> Courts concerned with separation of powers maintain that the public duty doctrine is necessary to avoid judicial scrutiny of every act of the other branches of government which has some effect upon the public.  Other courts . . . fear either a potential drain on the public coffers, or that the encouragement of increased litigation will deprive the municipality of funds for correcting the governmental error that gave rise to the complaint.  Other courts have viewed the issue from the government employee's perspective, maintaining that without the public duty doctrine such employees would be subject to an unreasonable litigation risk that could not be passed on to their clients.  In addition to reserving questions about the appropriate allocation of limited resources to the executive and legislature, and concern about the severe depletion of these resources, [this Court] has emphasized the need for public employees to have broad discretion in responding to demands given limited resources and the inescapable choices of allocation that must be made.  Without such a limitation on liability, the District would be potentially liable for every oversight, omission, or blunder made by a police, ambulance or building inspection official.

*Powell*, 602 A.2d at 1128 n.5 (internal quotation marks and citations omitted).[7]

---

1990) (man requesting ambulance was advised to try aspirin first, and as a result was not timely hospitalized); *Hines*, 580 A.2d 133 (ambulance crew failed to timely call for advanced life support unit); *Johnson v. District of Columbia*, 580 A.2d 140 (D.C. 1990) (assurances that ambulance was en route were inaccurate and eventual responders misdiagnosed victim's condition); *Klahr v. District of Columbia*, 576 A.2d 718 (D.C. 1990) (couple murdered by escapee from District half-way house); *Akins v. District of Columbia*, 526 A.2d 933 (D.C. 1987) (victim of crime committed by person released from jail due to error in District record); *Platt v. District of Columbia*, 467 A.2d 149 (D.C. 1983) (fire victims in unsafe nightclub after inspections).

[7]      On September 25, 2014, a divided division of the D.C. Court of Appeals affirmed the dismissal, on public duty doctrine grounds, of an action brought by the survivors of a prospective firefighter who died after experiencing medical distress while participating in a physical ability test.  The plaintiffs claimed that FEMS did not respond adequately to the medical emergency.  *Allen v. District of Columbia*, 100 A.3d 63, 65-67 (D.C. 2014).  The majority in *Allen* upheld the trial court's dismissal of the action on public duty grounds, finding that the allegations "'amount[ ] to the same basic allegation' that we held in *Hines* [580 A.2d at 139] is barred by the public duty doctrine."  *Id* at. 79.  Judge Easterly dissented, calling for "rehearing en banc because there are compelling reasons to discard the public duty doctrine."  *Id.* at 83, 89.  On June 15, 2015, the D.C. Court of Appeals granted the petition for rehearing en banc.  (The Court thereafter vacated the *Allen* decision on October 29, 2015).  The Court consolidated *Allen* with another pending appeal (*Wright v. District of Columbia*, No. 13-CV-583) and ordered the parties to file briefs "addressing whether the public duty doctrine should continue to be recognized by

Under the public duty doctrine, a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, *greater than or different from any duty which it owed to the general public*." *Klahr*, 576 A.2d at 719 (emphasis added).

Plaintiffs admit that they are members of the general public. The Master Complaint alleges that the District "breached its duty to provide prompt competent medical treatment and fire rescue *to the general public*, *including the passengers trapped on Train 302*." Master Compl. ¶ 340 (emphasis added).

---

this court, and, if so, what the proper scope of the doctrine should be." *See* Order in *Allen v. District of Columbia*, No. 10-CV-1425, 2015 WL 5725532 (June 15, 2015). Presumably in response (and before the initial decision in *Allen* was vacated), the Council unanimously enacted, and the Mayor signed, the Emergency Medical Services Contract Authority Emergency Amendment Act of 2015, D.C. Act 21-154, 62 D.C. Reg. 13701 (Oct. 23, 2015), which included language ratifying the public duty doctrine up through the division decision in *Allen*. Next, the Council unanimously passed, and the Mayor signed, the Emergency Medical Services Contract Authority Temporary Amendment Act of 2015, D.C. Act 21-207, 62 D.C. Reg. 15597 (Dec. 4, 2015), with the same language. D.C. Law 21-55, 63 D.C. Reg. 1479 (2016). On June 21, 2016, the Council unanimously passed the Fiscal Year 2017 Budget Support Act of 2016, which is permanent legislation that included language similar to the temporary legislation ratifying the public duty doctrine. D.C. Code § 5-401.02 ("The Council ratifies the interpretation and application of the public duty doctrine by the District of Columbia Court of Appeals up through the decision of September 25, 2014, in *Allen v. District of Columbia*, No. 10-CV-1425. . ."). The permanent act became effective on October 8, 2016. *Id.* The Court of Appeals has ordered the parties in the *Allen* and *Wright* appeals to file additional briefing addressing the effect of the Council's legislation, and has not issued any decision in those consolidated appeals.

Decisions of the D.C. Court of Appeals are binding precedent unless they are overturned by an en banc decision of the Court of Appeals. *See, e.g. M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("As a matter of internal policy, we have adopted the rule that no division of this court will overrule a prior decision of this court. . . and that such result can only be accomplished by this court en banc."). Thus, the Court of Appeals may not overturn the public duty doctrine set forth in *Warren* and its progeny unless it does so in an en banc decision, which it has not yet done. Moreover, as the District argued in the additional briefing in the *Allen* and *Wright* appeals, the recent legislation precludes the Court of Appeals from overturning the public duty doctrine in the future. Regardless of the outcome of those appeals, it is clear that the public duty doctrine, as articulated in prior holdings of the Court of Appeals, is currently the law of the District of Columbia.

11

To avoid the public duty doctrine, Plaintiffs (and WMATA) must allege facts sufficient to establish that the District had a "special relationship" with them.  Plaintiffs can show a special relationship: "(1) by showing a direct or continuing contact between [them] and the governmental agency, along with justifiable reliance … or (2) by a statute prescribing mandatory acts for the protection of a particular class of persons rather than the public."  *Snowder*, 949 A.2d at 604 (citations omitted).

In this case, Plaintiffs fail to allege any facts that could establish that they have a "special relationship" with the District.  There is no statutory (or any other) obligation on the part of the District to respond specifically for the benefit of the individual passengers on Train 302 (as opposed to any other member of the general public).  There is no allegation of "direct or continuing contact" with any of the Plaintiffs, which generally requires "a direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured[,"] *Powell*, 602 A.2d at 1130 (quotations and citation omitted), or any other "form of privity between the [agency] and the victim that sets the victim apart from the general public."  *Warren*, 444 A.2d at 10 (Kelly, J., concurring in part and dissenting in part) (citation omitted).  That Plaintiffs requested and received emergency services is not enough; a "special relationship does not come into being simply because an individual requests assistance from the police."  *Morgan*, 486 A.2d at 1312-13; *Hines*, 580 A.2d at 136 ("Our case law makes clear that the mere fact that an individual has emerged from the general public and become an object of the special attention of public employees does not create a relationship which imposes a special duty.").  This distinction "rationally limit[s] the class of persons to whom the municipality's duty of protection runs …."  *Taylor*, 776 A.2d at 1215 (quotations and citations omitted).

12

More importantly, Plaintiffs failed to allege that they justifiably relied on any first response efforts by the District.  Justifiable reliance "means particular or special reliance." *Morgan*, 468 A.2d at 1315.  Pleading generalized reliance on an expectation of emergency services is insufficient. *See id*.  "[A]ctions that are a necessary part of the on-scene responsibility of government agents … add nothing to the general duty owed the public and fail to create a special relationship which imposes a special legal duty." *Allison Gas Turbine*, 642 A.2d at 825 (quotations, citations, and brackets omitted).  "That is, while the District may be liable for an official's affirmative act that worsens a victim's condition, it will not be liable for that official's inaction or futile action." *Snowder*, 949 A.2d at 604 (citations omitted).  Indeed, there is no justifiable reliance even if the plaintiff "relied to his or her detriment upon actions or representations by District employees providing emergency assistance." *Woods*, 63 A.3d at 555 (citations omitted).

*Allison Gas Turbine* is instructive.  642 A.2d at 825.  There, a helicopter with a pilot and three passengers crashed into the Potomac River. *Id*. at 842.  The pilot escaped, but the three passengers remained trapped inside the helicopter. *Id*.  On the scene, the Harbor Patrol rejected civilian scuba divers' entreaties to assist with the rescue and instead opted to wait for the necessary diving equipment to arrive. *Id*.  The delayed rescue effort was unsuccessful, and all three passengers drowned. *Id*.  In affirming the lower court's grant of summary judgment in the District's favor, the Court of Appeals held that the "Harbor Patrol officers' conduct was directly related to the officers' 'on-scene responsibility' in conducting the rescue operation, *i.e*., it was an integral part of the officers' general duty to the public and, therefore, did not create a special relationship." *Id*. at 845.  The Court also noted that "[c]arrying out that responsibility necessarily required the exercise of discretion, on the part of the rescuers, concerning how they should

13

proceed ….." *Id.* Such acts "during a rescue operation cannot be later dissected at trial …." *Id.* (citation omitted).

Similarly, in *Miller*, 841 A.2d 1244 (D.C. 2004), the plaintiff sued the District under the wrongful death and survival statutes following the accidental death of two of her children in a house fire. The plaintiff alleged that FEMS unreasonably delayed in arriving to the fire scene and that she abandoned her rescue efforts for her two children after a police officer misrepresented that they had been safely evacuated. *Id.* at 1245. The trial court dismissed the case on public duty grounds, and the D.C. Court of Appeals affirmed. The Court explained that "the actions of [emergency personnel] during a rescue operation are protected by the public duty doctrine, and are not subject to retrospective dissection at trial." *Id.* at 1248. The public duty doctrine barred the lawsuit, even though the plaintiff "relied to [her] detriment on a negligent misrepresentation of fact … rather than on a discretionary assessment of the rescue scene." *Id.*

More recently, in *Woods*, 63 A.3d at 558, the Court of Appeals held that a stroke victim's reliance on an alleged misdiagnosis by FEMS personnel did not give rise to a special relationship. In *Woods*, paramedics allegedly incorrectly determined that the plaintiff had become ill because she had stopped smoking cigarettes. *Id.* at 552. Based on this misdiagnosis, FEMS did not transport the plaintiff to the hospital for additional treatment. *Id.* The plaintiff suffered a "completed stroke" the following morning. *Id.* The Court explained that the public duty doctrine shields from judicial scrutiny the "kind of on-the-scene emergency assistance that the District normally provides to the general public." *Id.* at 556. The court also emphasized its "strict interpretation of the special relationship test, including the justifiable reliance prong[,]" *id.* at 554 (quotations and citations omitted), and held that "detrimental reliance on a negligent judgment call, discretionary determination, or incorrect statement of fact by a District employee

14

providing on-the-scene emergency services does not constitute the kind of actual and direct worsening of the plaintiff's condition that will permit imposition of negligence liability …." *Id.* at 557 (quotations, citations, and alterations omitted).

Here, OUC received calls for service and dispatched FEMS personnel to respond to these calls. This response was for the benefit of the public generally, regardless of how many people were on the train, the time of day or night, the location of the incident, or the cause of the emergency. Plaintiffs allege no facts that establish that any part of the rescue effort "in some demonstrable way exceed[ed] the response generally made [available] to other members of the public." *Wanzer*, 580 A.2d at 132. This falls well short of meeting the special relationship hurdle. *See id.* ("[P]laintiff neither asked for, nor would he in all likelihood have received, a response different in any way from the response generally made to such requests, *i.e.*, the dispatch of an ambulance."); *Johnson,* 580 A.2d at 143 ("[P]ermutations of the issue of the 'adequacy and timeliness' of emergency aid … cannot … form the basis of liability."); *Woods*, 63 A.3d at 557-58 ("The theory of liability … rests on a claim that [the plaintiff] suffered injury because she relied to her detriment on the response of District employees who were providing her the same type of emergency services they would provide to any member of the general public. Our cases foreclose that theory of liability."). Because Plaintiffs admit that they were the recipients of public services provided by the District to the public at large, and because they fail to allege any facts establishing a special relationship with the District, the public duty doctrine bars their claims.

**B.     The Public Duty Doctrine Bars WMATA's Cross-Claims, and WMATA Cannot Rely on Metro Rail Transit-Fire/Rescue Emergency Procedures Policy Agreement to Establish a Special Relationship with the District.**

The public duty doctrine bars WMATA's cross-claims for the same reason that it bars Plaintiffs' claims: the District may not be held liable for the allegedly negligent provision of (or failure to provide) emergency rescue services to members of the public.  WMATA appears to argue that it has a special relationship with the District that precludes application of the public duty doctrine.  Specifically, WMATA identifies the Policy as a "specific undertaking agreed to by the District so as to protect WMATA."  Cross-claim ¶ 13.  WMATA notes that it "does not have its own fire department[,]" and that it is "completely dependent and justifiably reliant [on FEMS] to provide fire and emergency medical services within the WMATA system." *Id*.  Thus, WMATA apparently seeks to show that the District owed WMATA a duty that was greater than or different from the duty that the District owed to the general public.  This is not a plausible argument.

WMATA's conclusory allegation that the Policy is a "specific undertaking agreed to by the District so as to protect WMATA," Cross-claim ¶ 13, is a legal conclusion that the Court should not accept.  An examination of the Policy makes clear that it does not establish a "special relationship."  First, the Policy does not qualify as a "direct or continuing contact." *Snowder*, 949 A.2d at 604.  Rather, it is a document that "provide[s] a foundation in which specific and related operational procedures *may* be developed and implemented by WMATA and each relevant fire/service agency."  Policy 3 (emphasis added).  A policy statement that provides guidance about what "may be developed" adds nothing to the District's general duty to respond to public emergencies.

16

Moreover, WMATA's apparent interpretation of the "direct or continuing contacts" test ignores that the "contact" must be between the city and "the person injured." *Powell*, 602 A.2d at 1130; *Taylor*, 776 A.2d at 1215 ("the government must engage in an affirmative undertaking of protection on which *the victim* justifiably relies") (quotations and citations omitted) (emphasis added). Nothing in the cross-claim suggests that WMATA itself (as opposed to its passengers) was injured by the District's emergency response. Similarly, no case law in this jurisdiction recognizes a cross-claimant's potential legal liability to a plaintiff as an "injury" for purposes of the public duty doctrine.

The Policy also does not constitute a statute or regulation that provides "mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *Turner*, 532 A.2d at 667 (quotations and citations omitted). A special relationship under this theory requires "a duty [that] is narrow and specific, created by statute to benefit a precisely defined class of persons[.]" *Id*. at 673. The Policy is not a statute or regulation that carries the force of law. Nor does it require FEMS emergency responders act in a particular way for the benefit of a particular class of persons. *See Jeffries v. District of Columbia*, 917 F. Supp. 2d 10 (D.D.C. 2013).[8] Nothing in the Policy evinces the District's intent to provide WMATA with emergency services that are greater or different than the emergency services the District provides to the public as a whole.

Even when reading the Policy in the light most favorable to WMATA, WMATA could not have justifiably relied on it because the District's duty to provide fire and medical emergency

---

[8]     For example, in *Jeffries*, Judge Lamberth held that the D.C Youth Development Strategy Plan, a "police-community partnership formed to reduce violence in communities east of the Anacostia River[,]" could not establish a special relationship between the District and the decedent's parents because it did "not carry the force of law, or require government officials to act in any particular way[.]" *Id*. at 34.

services to WMATA is no different from the duty owed to the public at large.  *Nealon*, 669 A.2d at 693 ("A party must show that such contact was different from the type of contact that the District has with the general public."); *Woods*, 63 A.3d at 556 (The public duty doctrine bars "a claim that a plaintiff's situation was made worse because the plaintiff relied upon actions taken by District emergency personnel in providing the kind of on-the-scene emergency assistance that the District normally provides to the general public.").  WMATA's allegation that it particularly relied on this Policy because it "does not have its own fire department" does not distinguish WMATA from the general public.  As a result, the public duty doctrine bars WMATA's cross-claim.

## II.   Sovereign Immunity Bars Plaintiffs' Claims And WMATA's Cross-claims Against The District

### A.   The District's Emergency Response Involved Discretionary Functions That Are Immune From Suit.

The doctrine of sovereign immunity bars suit against the District for injuries stemming from the discretionary acts of government officials.  *Spencer v. General Hospital*, 425 F.2d 479, 483 (D.C. Cir. 1969) (en banc).  "Governmental actors have no immunity from suit based upon their ministerial actions, but they are immune from suit based upon their discretionary actions." *Casco Marina Dev*., *LLC v. District of Columbia*, 834 A.2d 77, 81 (2003); *District of Columbia v. Pace*, 498 A.2d 226, 228 (D.C. 1985) (the District "is immune from suit in tort if the act complained of was committed in the exercise of a discretionary function" (citing *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1985) (en banc)).  "Generally, discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy." *Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995) (citation omitted).  While discretionary acts require "personal deliberation, decision, and judgment … ministerial acts

require little or no judgment, and generally constitute mere obedience to orders or performance of a duty in which the municipal employee has little or no choice." *Id.* (quotations, citations, and brackets omitted). The critical inquiry is "'whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to *ensure fearless, vigorous, and effective decision making*.'" *Casco Marina*, 834 A.2d at 81 (quoting *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990)) (emphasis added). Thus, sovereign immunity precludes lawsuits second-guessing emergency decisions months and years after the fact. *See Chandler*, 404 A.2d at 966 (an official "cannot remain unaffected in his decision-making by the potential liability of the government for which he works"); *cf. Dalheimer v. City of Dayton*, 441 N.W.2d 534, 537 (Minn. Ct. App. 1989) ("Such-after-the-fact scrutiny would require that courts and juries dictate firefighting strategy, the amount of equipment deployed, and services offered by municipalities.").

Federal courts have also been clear in barring suits challenging discretionary acts.[9] In interpreting the discretionary function exception to the Federal Torts Claims Act (FTCA), federal courts routinely hold that sovereign immunity bars suits challenging the government's response to an emergency.

For example, in *Davis v. United States*, 597 F.3d 646 (5th Cir. 2009), the plaintiff's decedent died during a dramatic helicopter rescue attempt in the aftermath of Hurricane Katrina. In affirming the trial court's dismissal, the Fifth Circuit explained that the "failed rescue of the decedent resulted from an on-the-spot balance of the rescue need with the safety considerations of doing so with the equipment available. Safety, efficiency, timeliness, and allocations of

---

[9]    In analyzing the District's sovereign immunity, the D.C. Court of Appeals looks to federal court jurisprudence on the discretionary function exception to the FTCA. *Chandler*, 404 A.2d at 966 (citing *Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974)).

resources were all necessary to consider, the very policy considerations … that made the acts discretionary." *Id*. at 651. The rescue required "the kind of judgment the discretionary function exception was designed to shield." *Id*. at 650. *See also Woodward Stuckart*, *LLC v. United States*, 650 Fed. App'x 380, 383 (9th Cir. 2016) (emergency response to boating accident involved discretionary functions that barred suit under doctrine of sovereign immunity); *Spotts v. United States*, 613 F.3d. 559, 572-73 (5th Cir. 2010) (failure to evacuate inmates from prison in emergency situation involved discretionary function that barred claim under sovereign immunity); *Freeman v. United States*, 556 F.3d 326, 334-36 (5th Cir. 2009) (suit regarding emergency response to Hurricane Katrina barred by discretionary function exception under the Robert T. Stafford Disaster Relief and Emergency Assistance Act).

Clearly, the District's response to the Yellow Line fire required "fearless, vigorous, and effective decision making." *Casco Marina*, 834 A.2d at 81. Deciding how to evacuate over two hundred people trapped on a train in a smoking underground tunnel required decision making dictated by the circumstances of the immediate moment. *See Freeman*, 556 F.3d at 340 ("the government's decisions about when, where, and how to allocate limited resources within the exigencies of an emergency are the types of decisions that the discretionary function exception was designed to shelter from suit."). FEMS officials had to make on-the-spot determinations regarding the allocation of firefighting resources and the methods to effectuate the evacuation, including ensuring the safety of FEMS personnel and the passengers who were evacuated onto a track bed with a potentially energized third rail. There is an overriding public interest in ensuring that a municipality can respond to mass emergencies unrestrained by the specter of a future lawsuit.

In this case, Plaintiffs allege that the District was negligent in seven different respects:

a.      By failing to prioritize the immediate evacuation of Train 302's passengers;

b.      By failing to establish a unified command post with the MTPD, as required under NIMS protocol;

c.      By failing to effectively communicate and coordinate with the MTPD incident commander throughout the duration of the incident;

d.      By failing to inform the MTPD and the ROCC about FEMS's decision to turn off the power to the second railway track at L'Enfant Plaza;

e.      By refusing the MTPD incident commander's offer to utilize MTPD's radio communication system to overcome the communication difficulties caused by FEMS's malfunctioning radio system;

f.      By actively avoiding contact with the MTPD incident commander by refusing to allow him into the FEMS battalion chief's vehicle; and/or

g.      By otherwise creating an antagonistic environment that deterred effective communication and coordination between the on-site rescue teams.

Master Compl. ¶ 342.   Each of these alleged shortcomings necessarily involved discretionary decisions by the FEMS officials in charge, who had to weigh competing demands on their time and resources in responding to the emergency.   Sovereign immunity therefore bars Plaintiffs' negligence claim against the District.

For the same reasons, sovereign immunity bars WMATA's cross-claim.   WMATA alleges that FEMS' Incident Commander failed to establish a unified command post and that the District inadequately trained this Commander with respect to underground Metro emergencies. Cross-claim ¶¶ 20-30.

21

The Incident Commander's alleged failure to establish a unified command involved a "decision regarding fire protection." *Nealon*, 669 A.2d at 691. WMATA's allegations that the Incident Commander improperly relied on an individual messenger relay instead of using WMATA's two-way radios, Cross-claim ¶ 25, or improperly ignored the advice of WMATA's Transit Police Deputy Chief, *id.* at ¶ 26, even if true, are challenges to a battalion fire chief's judgment and decision-making in response to a mass emergency. Again, this is precisely "the kind of action 'that the discretionary function exception was designed to shield[.]'" *Aguehounde v. District of Columbia*, 666 A.2d 443, 448 (D.C. 1995) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)).

WMATA agrees that police and firefighting activities are "quintessential governmental" functions shielded from suit. WMATA Mot. to Dismiss [235] at 18 (citing *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (police activity) and *West v. Anne Arundel County, Md.*, 137 F.3d 752, 758 (4th Cir. 1998) (firefighting)).[10] In its Motion to Dismiss, WMATA asserts its own sovereign immunity as a defense to Plaintiffs' claim that WMATA personnel failed to timely evacuate Train 302. *Id.* at 19 ("when, where and how to rescue the passengers from Train 302 during an emergency situation implicates public policy, social and economic decisions …."). Nothing separates this "quintessential governmental" function of evacuating passengers during an emergency from the District's discretionary function of evacuating passengers during an emergency.

---

[10] This is in line with other jurisdictions which hold that firefighting constitutes a public or governmental function. *See, e.g.*, *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F. 2d 17, 24 (2d Cir. 1979) ("Fire protection is a function public or governmental in nature ….") (quotations and citation omitted); *Krieger v. Bethesda-Chevy Chase Rescue Squad*, 599 F. Supp. 770, 773 (D. Md. 1984) ("Unquestionably, firefighting is traditionally an exclusively public function.").

Similarly unavailing is WMATA's argument that the FEMS Incident Commander was inadequately trained because he did not attend the NIMS ICS 300 and 400 courses. Cross-claim ¶ 8. Here again, WMATA asserts its own sovereign immunity with respect to its training practices while cross-claiming against the District for the same alleged deficiency. WMATA identifies no law or regulation that specifically requires FEMS Incident Commanders to complete these courses. *See Felder v. WMATA*, 105 F. Supp. 3d 52, 57 (D.D.C. 2015) ("the parties have pointed to no law or policy specifically prescribing guidelines for the hiring, training, or supervision of … employees.") (quoting *Burkhart*, 112 F.3d at 1217) (alterations and quotations omitted). Moreover, how FEMS trains its Incident Commanders to respond to fire emergencies requires the exercise of political, social, and economic judgment. *Burkhart*, 112 F.3d at 1217 ("The extent of training with which to provide employees requires consideration of fiscal restraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from such norms in the past."). The same policy considerations that preclude judicial scrutiny of WMATA's training of its employees as to the proper use of ventilators apply *a fortiori* to FEMS' training of its personnel as to the proper response to public emergencies. WMATA Mot. to Dismiss [235] at 9 - 12.

### B. The Metrorail Transit-Fire/Rescue Emergency Procedures Policy Agreement Does Not Eliminate or Modify the District's Entitlement to Sovereign Immunity

Plaintiffs allege that the Metrorail Transit-Fire/Rescue Emergency Procedures Policy Agreement (the Policy) imposed on the District "the responsibility for providing fire and emergency services for all passengers trapped on Train 302." Master Compl. ¶ 341. Plaintiffs

may rely on this Policy to argue that the District had certain mandatory duties as part of its emergency response that precludes the sovereign immunity defense.  This argument fails.

*Freeman*, 556 F.3d 326, cited above, is instructive.  There, victims of Hurricane Katrina filed suit against the United States under the FTCA alleging that the United States was negligent in its relief efforts that resulted in several deaths.  Plaintiffs argued that the United States was not entitled to sovereign immunity because it failed to perform specific duties prescribed by the National Response Plan (NRP).[11]  Specifically, the plaintiffs alleged that the United States breached its duty under the NRP to provide food, water, shelter, medical assistance, and transport to local evacuation sites.  *Id*. at 337.  The Fifth Circuit rejected this argument.  The court noted that the language in the NRP "contain[ed] generalized, precatory, or aspirational language that [was] too general to prescribe a specific course of action for an agency or employee to follow." *Id*. at 338.  The court then explained that the specific "responsibilities" outlined in the NRP (*e.g*., "activating and deploying resources in accordance with NRP-CIS" or "maintaining communications to ensure a common understanding of resource requirements") were "so general" that they "required judgment and choice to make them applicable to specific situations." *Id*. at 339.  Thus, the discretionary function exception to the FTCA barred the suit against the United States.

Other circuits have reached a similar conclusion.  *See*, *e.g*., *Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997) ("the general goal of protecting human life in the nation's national parks is not the kind of specific mandatory directive that operated to divest [the official] of discretion in the situation he faced."); *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir.

---

[11]     The Department of Homeland Security promulgated the NRP which, in relevant part, "established the context and overarching strategy for implementing and coordinating an accelerated, proactive national response to a catastrophic incident[.]"  *Id*. at 330 (quotations, citation, and brackets omitted).

1999) (a "broadly worded expression of a general policy goal contained in the [agency's] operating manual … suggests that the [agency] and its functionaries will have to make discretionary judgments about how to apply concretely the aspirational goal embedded in the statement."); *Valdez v. United States,* 56 F.3d 1177, 1180 (9th Cir. 1995) ("While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which [agency] employees meet these goals necessarily involves an exercise of discretion."); *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993) ("Such a general guideline is insufficient to deprive the federal government of the protection of the discretionary function exception.") (quotations and citations omitted).

Here, the Introduction to the Policy states that it is "not intended to serve as the only set of governing procedures for WMATA or any jurisdictional fire department, but rather provide[s] a foundation in which specific and related operational procedures may be developed and implemented by WMATA and each relevant fire/service agency."  Policy 3.  By definition, the Policy confers discretion on emergency response officials to expand on this "foundation."  The document then articulates several Emergency Procedures by subject, with each section labeled as "POLICY."  Nothing in this Policy defines any scope of liability for WMATA or any of the signatory governments or agencies.   More importantly, nothing in this Policy specifically constrains the District's decision-making authority with respect to how to respond to a fire emergency.  *See Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) ("This Court requires the prescribed course of conduct be specific and mandatory.") (citations omitted). Generalized goals embedded in a policy statement bereft of any mandatory directives do not deprive the District of sovereign immunity.

25

## CONCLUSION

The allegations of the Master Complaint and WMATA's Cross-Claim make clear that Plaintiffs' claims against the District and WMATA's cross-claims are barred by the public duty doctrine. Because neither the Plaintiffs nor WMATA allege facts that establish that they had a "special relationship" with the District that would avoid application of the public duty doctrine, the Court should dismiss all claims and cross-claims against the District on this ground. In addition, because the Plaintiffs and WMATA seek to hold the District liable for discretionary actions taken by District officials in the course of preparing for or responding to the emergency, the District's sovereign immunity also bars their claims. For these reasons, the Court should grant the District's motion and dismiss, with prejudice, Count II of Plaintiffs' Master Complaint and WMATA's Cross-Claim.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Jonathan H. Pittman*
JONATHAN H. PITTMAN [430388]
Assistant Deputy Attorney General
Civil Litigation Division
Office of the Attorney General for the District of Columbia
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202) 724-6602
Email: jonathan.pittman@dc.gov

/s/ *William J. Chang*
WILLIAM J. CHANG [1030057]
Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 Fourth Street, NW, Suite 630 South

Washington, DC 20001
(202) 724-6646
Email: willliam.chang@dc.gov

**Counsel for the District of Columbia**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the YELLOW LINE CASES,<br><br>LEAD CASE: *Glover, et al., v. Washington Metropolitan Area Transit Authority*<br><br>THIS DOCUMENT RELATES TO: <u>ALL CASES</u> | )<br>)<br>)<br>)<br>)   Case No. 1:15-mc-00989-TSC-GMH<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] ORDER

Upon consideration of Defendant District of Columbia's Motion to Dismiss Plaintiffs' Master Complaint and Co-Defendant Washington Metropolitan Transit Authority's Cross-claim, any response thereto, and the entire record in this matter, it is hereby this _____ day of _____, 2017,

**ORDERED**:  that Defendant District of Columbia's Motion is granted; it is

**ORDERED**:   that Count II of Plaintiffs' Master Complaint [225] is dismissed with prejudice; and it is

**ORDERED**:  that Co-Defendant Washington Metropolitan Transit Authority's Cross-claim against the District of Columbia [236] is dismissed; and it is

**FURTHER ORDERED**: that this lawsuit is dismissed with prejudice with respect to the District of Columbia.

**SO ORDERED**.

_____
Tanya S. Chutkan
U.S. District Court for the District of Columbia