UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: | ) ) ) | |
| THE YELLOW LINE CASES | ) ) | Case No. 15-mc-0989 (TSC) (GMH) |
| This order relates to: ALL CASES | ) ) ) ) | |

**MEMORANDUM OPINION**

This case consolidates the claims of approximately 100 plaintiffs who allege injuries stemming from an incident on January 12, 2015 when they were trapped in a smoke-filled Metro train for approximately forty-five minutes. Plaintiffs filed separate cases against defendant Washington Metropolitan Area Transit Authority ("WMATA"), and later amended their complaints to include claims against the District of Columbia. WMATA has also filed a cross-claim against the District, which now moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Count II of Plaintiffs' Master Complaint and WMATA's cross-claim. (ECF No. 237, District Mem.).[1] Upon consideration of the parties' filings, the District's motion shall be GRANTED.

**I. BACKGROUND**

On January 12, 2015, at approximately 3:15 p.m., WMATA train 302 encountered dense smoke and came to an emergency halt in a tunnel several hundred feet past the L'Enfant Plaza Station on the Yellow Line track in the direction of Huntington, Virginia. (ECF No. 225, Master

---

[1] WMATA also moved to dismiss Plaintiffs' Master Complaint, (*see* ECF No. 235), but asked the court to stay consideration of its motion pending the result of ongoing settlement negotiations, and the court entered an Order on June 1, 2017 reflecting its intention to stay consideration of that motion. (*See* June 1, 2017 Minute Order).

1

Compl. ¶¶ 313–14). The train became disabled in the tunnel, without power and illuminated only by emergency lighting. (*Id.* ¶ 316). Passengers were instructed to stay on the train with the doors closed, as the train would be returning to L'Enfant Plaza station. (*Id.* ¶ 317). At approximately 3:18 p.m., a construction worker called the D.C. Office of Unified Communications ("OUC") and reported that smoke was emanating from a Metro ventilation shaft roughly a half-mile away from the train's location, and at approximately 3:22 p.m., a WMATA Supervisor of Metro Rail Unit 22 called OUC to report heavy smoke in the L'Enfant Plaza station. (*Id.* ¶¶ 320–21).

At 3:28 p.m., pursuant to D.C. Fire and Emergency Medical Services Department ("FEMS") protocol, OUC dispatched a "Metro Station Box Alarm," which included five Engine Companies, two Ladder Trucks, two Battalion Fire Chiefs, one Battalion Fire Chief to WMATA Operations Command Center, one Heavy Rescue Squad, one Basic Life Support Unit, one Advanced Life Support Unit, and one EMS Supervisor. (*Id.* ¶ 323). The first FEMS responders arrived at L'Enfant Plaza station at approximately 3:31 p.m., sixteen minutes after the train first became disabled. (*Id.* ¶ 324). Shortly thereafter, at 3:33 p.m., OUC received several calls from passengers on the train. (*Id.* ¶ 329). Approximately forty-five minutes after the train first became disabled, at 4:00 p.m., FEMS began evacuating the over 200 passengers from the train. (*Id.* ¶ 331).

Following this incident, approximately 100 Plaintiffs filed separate civil cases against WMATA, and these cases were consolidated in July 2015. Since February 2015, this case has been stayed pending the release of a Final Accident Report from the National Transportation

2

Safety Board ("NTSB").[2] However, in late 2016, the court partially lifted the stay to permit the Plaintiffs to file a single Master Complaint, which they did on December 9, 2016. (*See* ECF No. 225). Plaintiffs brought negligence claims against WMATA and the District and allege that they suffered severe injuries due to smoke inhalation and fear of impending death. One passenger, Carol Glover, ultimately died allegedly from smoke inhalation.

Specifically, Plaintiffs allege in Count I that WMATA owed them a duty of reasonable care as a common carrier and breached that duty by:

(a) Failing to properly inspect and maintain the third rail running through the relevant section of tunnel;

(b) Failing to properly inspect and maintain the ventilation system for the relevant section of tunnel;

(c) Failing to properly train its agents, servants, and/or employees in the proper activation and use of the ventilation system in the event of a fire or smoke emergency;

(d) Failing to calibrate its radio equipment to be compatible with that of FEMS despite having clear notice of its non-compliance;

(e) Failing to equip its trains, specifically Train 302, with safety equipment adequate for emergencies of this nature;

(f) Failing to adequately investigate the third-rail circuit breaker that tripped at 3:06 p.m. on January 12;

(g) Failing to move Train 302 to a safe location (e.g., back to the L'Enfant Plaza station) after it first encountered smoke in the tunnel;

(h) Failing to in a timely manner shut off electricity to the third rail in the relevant section of tunnel;

(i) Failing to in a timely manner inform FEMS that electricity had been shut off to the third rail in the relevant section of tunnel;

---

[2] The parties have represented to the court that while the NTSB issued a preliminary report on May 3, 2016, it has not yet issued a final report.

(j) Failing to in a timely manner evacuate Train 302 if and when it was determined that the train could or would not be moved and its cars were filling with smoke; and/or

(k) Otherwise negligently, carelessly, and wrongfully failing to take reasonable precautions to protect its passengers from injury and death.

(Master Compl. ¶ 336). Plaintiffs allege in Count II that FEMS "had a duty to provide prompt, competent medical treatment and fire rescue services to the general public, including the passengers trapped on Train 302." (*Id.* ¶ 340). They allege that the District breached that duty by:

(a) Failing to prioritize the immediate evacuation of Train 302's passengers;

(b) Failing to establish a unified command post with the MTPD, as required under NIMS protocol;

(c) Failing to effectively communicate and coordinate with the MTPD incident commander throughout the duration of the incident;

(d) Failing to inform the MTPD and the ROCC about FEMS's decision to turn off the power to the second railway track at L'Enfant Plaza;

(e) Refusing the MTPD incident commander's offer to utilize MTPD's radio communication system to overcome the communication difficulties caused by FEMS's malfunctioning radio system;

(f) Actively avoiding contact with the MTPD incident commander by refusing to allow him into the FEMS battalion chief's vehicle; and/or

(g) Otherwise creating an antagonistic environment that deterred effective communication and coordination between the on-site rescue teams.

(*Id.* ¶ 342).

WMATA's cross-claim against the District states ten Counts for contribution or indemnity based on delegated duty, negligent training, and negligence, and alleges that the

4

District has an implied contractual duty or an equitable duty to indemnify WMATA based on the Fire Chiefs' Agreement.[3]  (ECF No. 236, Cross-Claim ¶¶ 34–85).

WMATA alleges that FEMS failed to follow the procedures in the Fire Chiefs' Agreement, most significantly by failing to establish the Unified Incident Command and ignoring the MTPD Deputy Chief's efforts to report to that Unified Incident Command and provide critical information to facilitate the emergency response.  (Cross-Claim ¶ 20).  WMATA claims that as a result, the FEMS Incident Commander failed to ascertain that the train's passengers were trapped inside a smoke-filled tunnel.  (*Id.* ¶ 21).  WMATA also alleges that due to problems with the District's radio communication system, FEMS relied on a system of individuals running in and out of the station to relay messages between responders and officials, causing substantial delays, and had FEMS established the Unified Incident Command, FEMS would have been able to coordinate communications by using MTPD's radios instead.  (*Id.* ¶ 25).

As of the date of this Opinion, sixty-two individual plaintiffs have stipulated to dismissal of their claims with prejudice and their claims have subsequently been dismissed.  (*See* ECF Nos. 256, 257, 260, 261, 265).

---

[3] WMATA does not have its own fire department, and instead is a party to the Metro Rail Transit – Fire/Rescue Emergency Procedures Policy Agreement, also referred to as the Fire Chiefs' Agreement.  (Cross-Claim ¶¶ 12–13; Fire Chiefs' Agreement (ECF No. 236-2)).  Under the Agreement, during emergency incidents, local fire departments' senior officials—such as FEMS officials in the District—are assigned the role of Incident Commander and "hav[e] the authority to control the emergency."  (Cross-Claim ¶ 15; Fire Chiefs' Agreement at 11–13).  A senior Metro Transit Police Department ("MTPD") official acts as "WMATA's On-Scene Commander" and reports to the FEMS official acting as the Incident Commander and "coordinate[s] the activities between the Incident Commander and WMATA employees."  (Cross-Claim ¶ 16; Fire Chiefs' Agreement at 13).

## II. LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when it alleges sufficient facts to permit the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555–57 (internal quotation marks omitted). Evaluating a 12(b)(6) motion is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. ANALYSIS

The District moves to dismiss Count II of Plaintiffs' Master Complaint and WMATA's cross-claim, arguing that they are barred by the public duty doctrine and by sovereign immunity.[4]

### A. Sovereign Immunity

It is "settled" that the District is "protected by sovereign immunity if the [challenged governmental] acts are 'discretionary,' but subject to liability if the acts were 'ministerial' in character." *Rieser v. District of Columbia*, 563 F.2d 462, 475 (D.C. Cir. 1977). Because "sovereign immunity claims are jurisdictional," *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C.

---

[4] Plaintiffs filed a three-page Opposition to the District's motion to dismiss, adopting in full the arguments raised by WMATA in its own Opposition. (ECF No. 244). Because Plaintiffs raise no independent arguments, the court will refer only to WMATA's arguments.

Cir. 1997), the court will analyze this issue before turning to the District's alternative ground for dismissal.

In determining whether the District was protected by immunity, the Court in *Rieser* declared that "[a]n action will be considered 'discretionary' only if the prospect of liability for the decisions the officer must make in the course of his performance would unduly inhibit the officer's ability to perform his function." *Rieser*, 563 F.2d 462 at 475 (citing *Spencer v. Gen. Hosp. of the District of Columbia*, 425 F.2d 479, 481 (1969) (*en banc*)). The D.C. Court of Appeals has articulated the test for whether the District is immune from suit as "whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to assure fearless, vigorous, and effective decisionmaking." *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990) (internal quotation marks omitted). That court has also stated that "[g]enerally, discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy," *Nealon v. District of* Columbia, 669 A.2d 685, 690 (D.C. 1995) (citing *McKethean v. WMATA*, 588 A.2d 708, 715 (D.C. 1991)), and "[w]here there is room for policy judgment and decision, there is discretion," *McKethean*, 588 A.2d at 715 (quoting *Dalehite v. United States*, 346 U.S. 15, 36 (1953)).

This discretionary-ministerial test mirrors that of the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), and D.C. courts look to federal FTCA discretionary function cases in their own analysis. *See, e.g.*, *McKethean*, 588 A.2d at 715 (citing *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) for discretionary-ministerial analysis). In *Berkovitz,* the Supreme Court held that under the FTCA, the court's role is to assess whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the

directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function to protect." 486 U.S. at 536. The D.C. Court of Appeals prescribed a similar approach: considering whether "any statutes or regulations . . . would limit the discretion of the District in" performing the challenged acts and if the claimant has "identif[ied] any specific directives to implement those [cited] policies which might make [the act] a ministerial action." *McKethean*, 588 A.2d at 715 (citing *Berkovitz*, 486 U.S. at 536).

WMATA argues that the Fire Chiefs' Agreement is the type of "policy" that required a specific course of action for FEMS to follow. It further argues that the Agreement's terms were specific enough that all acts taken in response to the January 2015 incident were ministerial, rather than discretionary, and therefore the District is not immune from suit.

The District first argues that the emergency response "necessarily involved discretionary decisions by the FEMS officials in charge, who had to weigh competing demands on their time and resources in responding to the emergency" and that "FEMS officials had to make on-the-spot determinations regarding the allocation of firefighting resources and the methods to effectuate the evacuation." (District Mem. at 20–21). WMATA responds that in a motion under Rule 12(b)(6) the District may not assert facts outside the Complaint (or Cross-Claim), particularly when they state facts in a motion without supporting evidence. Accordingly, WMATA argues that the court should decline to weigh in on the sovereign immunity question prior to discovery on the issue of whether FEMS officials actually acted within discretion. However, the sovereign immunity analysis here does not turn on those facts. Following the analysis set forth by the Supreme Court in *Berkovitz* and the D.C. Court of Appeals in *McKethean,* the court looks first to the specific language of the policy that WMATA alleges constrains the District's discretion—

8

i.e., the Fire Chiefs' Agreement—to determine whether it is specific enough to strip FEMS officials of all discretion.

The language of the Agreement plainly permits (and in some instances requires) officials to exercise judgment or make choices in the course of their duties. Most significantly, the Introduction states that the procedures outlined in the Agreement "are not intended to serve as the only set of governing procedures for WMATA or any jurisdictional fire department, but rather *provide a foundation in which specific and related operational procedures may be developed and implemented* by WMATA and each relevant fire/service agency." (Fire Chiefs' Agreement at 3 (emphasis added)). Policy No. 2008-02 of the Agreement, titled "Fire/Rescue Emergency Response," provides that "Jurisdictional fire/rescue services with WMATA emergency responsibilities will coordinate service activities and response procedures to insure that adequate resources are dispatched to emergencies." (*Id.* at 10). For emergencies in a tunnel, "units shall be dispatched to an access point on each end of the emergency" and "[t]he type and severity of the emergency will determine the extent of WMATA personnel and equipment on the scene." (*Id.*). Policy No. 2008-03, titled "Command and Control," states that the Incident Commander—defined as "[t]he senior fire official of the jurisdiction having the authority to control the emergency"—"will assume overall command of the incident" and "is responsible for controlling the incident until the emergency is concluded." (*Id.* at 11–13). This policy requires the Incident Commander will: "immediately establish a 'command post' (CP) for all emergencies . . . located in proximity of the incident;" "[be] accountable for the assignment and safety of all personnel on the scene;" "establish a 'hot' zone;" "be responsible for maintaining accountability for fire/rescue personnel;" "ensure that all personnel responding to an emergency use the level of personal protection equipment appropriate for the incident;" and "[a]t the conclusion of the

9

emergency . . . clear the scene." (*Id.* at 12–13). For "major emergencies, the Incident Commander may dispatch a fire department representative to [WMATA's Operations Control Center] to assist with incident coordination." (*Id.* at 13).

The court concludes that this language does no more than, in the Agreement's own words, "provide a foundation" that is too generalized to prescribe a specific course of action for FEMS or a specific FEMS official to follow. Phrases such as "assume overall command," "control[] the incident," and "maintain[] accountability" simply do not convert decisions that would otherwise involve discretion and policy analysis, such as balancing the unique demands of the emergency with available resources, into mere ministerial acts involving no choice or judgment.

Under the FTCA, once the court finds that there is no policy (or statute) that constrains the exercise of discretion, it must next determine "whether that [challenged act] is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Similarly, in evaluating the District's immunity from suit, the court considers "if the prospect of liability for the decisions the officer must make in the course of his performance would unduly inhibit the officer's ability to perform his function," *Rieser*, 563 F.2d at 475, and "whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to assure fearless, vigorous, and effective decisionmaking." *Moss*, 580 A.2d at 1020 (internal quotation marks omitted).

In the court's view, the high level strategy and decisions involved in the response to a fire emergency such as this one, in which FEMS officials may have to consider competing demands, availability of resources, coordinating with other agencies, and maintaining the safety of FEMS responders, all in a quickly evolving emergency situation, is clearly the type of activity that

10

justifies official immunity to assure, as the *Moss* Court described, "fearless, vigorous, and effective decisionmaking."

Of the several cases cited by the District, the court notes that *Freeman v. United States*, 556 F.3d 326 (5th Cir. 2009)—a Fifth Circuit FTCA case involving allegations that the federal government caused or contributed to the death of individuals by negligently failing to offer timely aid following Hurricane Katrina—is particularly instructive. The Court held that "the government's decisions about when, where, and how to allocate limited resources within the exigencies of an emergency are the types of decisions that the discretionary function exception was designed to shelter from suit." *Freeman*, 556 F.3d at 340. The Court further explained that "decisions regarding the feasibility, safety, and benefit of mobilizing federal resources in the aftermath of a national disaster are grounded in social, economic, and public policy . . . . As such, these decisions are clearly 'susceptible to policy analysis,' even if specific decisions were not the result of such a reasoned analysis." *Id.* at 341. The court reaches the same conclusion here. While the emergency in this case was far smaller in scope than the "national disaster" considered in *Freeman*, the government officials coordinating the response to the smoke-filled train on January 12 were similarly tasked with making decisions "susceptible to policy analysis."

Therefore, the court finds that in the absence of a policy mandating specific actions with no room for judgment on the part of FEMS officials, FEMS' actions were protected by the District's sovereign immunity, and the court agrees that the District is immune from suit in this case.

WMATA also argues that even if Plaintiffs' claims are barred by sovereign immunity, WMATA's cross-claim is not, due to its status as a "regional governmental entity." WMATA asserts that "[t]here is no precedent holding that a District agency like FEMS cannot be bound by

its formal agreements with other entities," and "WMATA and the District should be treated as two entities on equal footing in terms of evaluating the applicability of any sovereign immunity defense." (WMATA Opp. at 15, 17). But the District does not appear to argue that "FEMS cannot be bound by its formal agreements," only that it is immune from liability in this particular case, given the nature of the challenged actions. Moreover, WMATA cites no cases supporting or requiring a different sovereign immunity analysis simply because the claimant is a governmental entity. Instead, as explained above, the court's sovereign immunity analysis turns on whether a statute or policy mandates specific actions and whether the challenged actions allow "significant enough application of choice to justify official immunity." *Moss*, 580 A.2d at 1020. WMATA's status as a governmental entity does not impact this analysis, and the court's conclusion remains unchanged. Accordingly, the court will GRANT the District's motion to dismiss Count II of Plaintiffs' Master Complaint and WMATA's cross-claim.

### B. Public Duty Doctrine

The District argues that it cannot be held liable for Plaintiffs and WMATA's claims because it did not owe a duty of care to any particular individual, but rather only to the public. "Under the public duty doctrine, the 'District has no duty to provide public services to any particular citizen' unless there is a 'special relationship' between the emergency personnel—police officers, firefighters, and EMTs—and an individual." *Woods v. District of Columbia*, 63 A.3d 551, 559 (D.C. 2013) (Oberly, J., concurring) (quoting *Allison Gas Turbine Div. of Gen. Motors Corp. v. District of Columbia*, 642 A.2d 841, 843 (D.C. 1994)). As a result, "the District generally cannot be held liable in negligence for its failure to provide services to the general public." *Id.* at 553.

The court's finding that Plaintiffs' claims and WMATA's cross-claim are barred by the District's sovereign immunity means this court lacks jurisdiction to hear this case. A district court may not "d[i]ve into the merits of [a] case" if it finds that it lacks jurisdiction, because that would be "stepp[ing] where the Constitution forbade it to tread." *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016). Having concluded that it is without jurisdiction, the court sees no need to venture into potentially forbidden territory by evaluating what may be a merits defense—that Plaintiffs and WMATA cannot establish the elements of a negligence claim due to a lack of duty.

Moreover, the court notes that on June 15, 2015, the D.C. Court of Appeals vacated an earlier decision involving the public duty doctrine and scheduled rehearing *en banc* to consider "whether the public duty doctrine should continue to be recognized by this court, and, if so, what the proper scope of the doctrine should be." *Allen v. District of Columbia*, 2015 WL 5725532, at *1 (D.C. June 15, 2015) (vacating *Allen v. District of Columbia*, 100 A.3d 63 (D.C. 2014)). In light of the current uncertainty as to whether the public duty doctrine will remain a defense to negligence liability, this court declines to engage in its own analysis of that doctrine at this time.

## IV. CONCLUSION

For the foregoing reasons, the court will GRANT the District's motion to dismiss Count II of Plaintiffs' Master Complaint and WMATA's cross-claim.

A corresponding order will issue separately.

Date: August 10, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge